# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| DIANALYN WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:14-CV-116-TLS |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Dianalyn Wilson, seeks review of the final decision of the Commissioner of the Social Security Administration denying her application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). On May 26, 2010, the Plaintiff filed applications for SSI and DIB, alleging disability beginning on May 15, 2010. An ALJ held a hearing on August 11, 2011, at which the Plaintiff—who was represented by an attorney—and a vocational expert (VE) both testified. On August 15, 2011, the ALJ found that the Plaintiff has the severe impairments of bipolar disorder and learning impairment. However, she ultimately concluded that the Plaintiff is not disabled. The Plaintiff requested review of the ALJ decision, and on September 13, 2012, the Appeals Council denied the Plaintiff's request for review. On April 11, 2014, the Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND

### A.    Plaintiff's Testimony

The Plaintiff is 36 years old and was 30 years old at the alleged disability onset date. The

Plaintiff lives with her family, including her daughter. The Plaintiff dropped out of school after seventh grade and had been enrolled in special education classes. Since leaving school, the Plaintiff has worked as a cashier, a factory worker, a fast food worker, and a truck driver.

At the ALJ hearing on August 11, 2011, the Plaintiff testified that she has anxiety and "life" makes it worse. (R. at 66.) The Plaintiff also testified that she has a "huge problem" with crowds of people, but even being in a room with a couple people, similar to the ALJ's hearing room, caused her heart to race. (R. at 68–69.) When asked whether she could go to the supermarket to purchase several items on a list, the Plaintiff testified that the anxiety caused by being at the supermarket would make her worry about everything around her and she would not remember that she had a list. The Plaintiff also stated that she has an eleven-year-old daughter, but the Plaintiff does not attend school activities and she participates in parent-conferences over the phone because she does not like the group setting.

The Plaintiff testified that during the day, she is able to cook and watch television. However, she does not cook for her family because she is "afraid of messing it up" (R. at 70) and she does not do laundry, go shopping, or do any household chores. In addition to watching television, the Plaintiff testified that she will sleep during the day because she does not sleep at night. Although the Plaintiff testified that she is able to shower on her own, she does not shower very often because she feels like she is "not worthy of a shower." (R. at 73.) The Plaintiff also indicated that she was not currently seeing a therapist because she had not "found one that works for [her]" (R. at 66), but she was still taking medication. She reported that she experienced side effects form these medications, specifically that one drug makes her "hands and feet go numb," and the other drug causes "headaches on top of the anxiety." (R. at 66–67.)

The Plaintiff also described her difficulties with staying focused on an activity. For example, she testified that she cannot pay attention to an entire movie and she does not remember what has happened in a television show while she is watching it. Similarly, the Plaintiff testified that she will not retain what she read in a chapter of a book and will need to try to read it again. Further, the Plaintiff testified that she will start washing dishes, but will be distracted by a television program, walk away from the dishes, and forget to go back and finish cleaning them. As a result, the Plaintiff estimated that, if she finishes the dishes, it takes her "[a]bout three hours" to do so. (R. at 73.)

The Plaintiff also testified about her pervious work experience. She explained that she used to work at Burger King as a fast food worker and a cashier. However, the Plaintiff reported that she was let go "because [she] came up short on [her] drawer too many times—well, I miscounted too many times on my money." (R. at 71.) The Plaintiff also discussed her time as a truck driver. The Plaintiff testified that her anxiety affected her ability to perform that job, and in particular, she abandoned her "truck on the side of the road and . . . got on a bus and came home" because she "got too overwhelmed" after getting lost so many times. (R. at 72.) Further, the Plaintiff testified that at her factory job she was required to meet a certain level of productivity within a day, but she was unable to complete everything within the day "[b]ecause [she] would get off task." (R. at 75.)

**B.**     **Vocational Expert's Testimony**

At the hearing, the vocational expert (VE) testified that an individual of the Plaintiff's age, education, and work experience who could understand, remember, and carry out simple

tasks in job instructions, and could have brief, superficial contact with supervisors, coworkers, and the general public, could not perform any of the Plaintiff's past relevant work. However, the VE opined that such an individual could perform unskilled, light work as an encapsulator, a cleaner/housekeeping, a folder, or an inspector. When the VE added the additional restrictions of "[n]o production rate paced jobs" or "need[ing] to be reminded of tasks once a day," the individual would still be able to work those jobs. (R. at 80.) If the individual was also "unable to sustain concentration and persistence for even minimum two hour periods at a time," then she would be unable to perform any jobs in the national economy. (R. at 81.)

## C.      ALJ Decision (Five-Step Evaluation)

The Social Security regulations set forth a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); 42 U.S.C. § 423(d)(1)(A) (defining a disability under the Social Security Act as being unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); § 423(d)(2)(A) (an applicant must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy"). The first step is to determine whether the claimant is presently engaged in substantial gainful activity (SGA). Here, the ALJ found that the Plaintiff was not engaged in SGA, so she moved on to the second step, which is to determine whether the claimant had a "severe"

4

impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The ALJ determined that the Plaintiff's severe impairments are bipolar disorder and learning impairment.

At step three, the ALJ concluded that the Plaintiff did not have an impairment, or combination of impairments that meets or medically equals the severity of one of the impairments listed by the Administration as being so severe that it presumptively precludes SGA. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Because the Plaintiff's impairment was found not to meet or equal a listed impairment, the ALJ was required, at step four, to determine the Plaintiff's residual functional capacity (RFC). RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96–8p. The relevant mental work activities include understanding, remembering, and carrying out instructions; responding appropriately to supervision and co-workers; and handling work pressures in a work setting. 20 C.F.R. § 404.1545(c). The ALJ concluded that the Plaintiff had the RFC to perform "a job that entails the understanding, remembering[,] and carrying out of simple tasks and job instructions" and "is limited to brief interaction with her supervisors, co-workers[,] and the public." (R. at 50.)

At the final step of the evaluation, the ALJ determined that, in light of the Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform.

## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). A court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). If the Commissioner commits an error of law, remand

is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

On appeal, the Plaintiff contends that, in determining her RFC, the ALJ (1) erred by not giving controlling weight to the opinions of the Plaintiff's treating physician, Dr. Lee Periolat (psychiatrist); and (2) improperly discredited the Plaintiff's testimony about her functional limitations. The Plaintiff does not challenge any of the ALJ's findings regarding her physical limitations, but contests the evidence related to her mental impairments. The Court will address each issue in turn.

### A.     Opinions of Treating Physician

An ALJ is tasked with evaluating opinion evidence when making a determination of disability. A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must offer good reasons for discounting a treating physician's opinion. *Id.* Even when the treating physician's opinion does not deserve "controlling weight," the ALJ must consider certain factors—namely, (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) how supportable the doctor's medical opinion is; (4) how consistent the doctor's opinion is with the record; (5) the doctor's specialization; and (6) other factors that might support or contradict the doctor's opinion—to determine what weight to give

the opinion. *Id.* The ALJ must give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. *Id.*

Dr. Periolat, a board certified psychiatrist, most recently began treating the Plaintiff on August 24, 2010. The Plaintiff had previously seen Dr. Periolat in 2008 and 2009, but she did not return for follow-up appointments in 2009. In his notes from the August 24, 2010, appointment, Dr. Periolat stated that the Plaintiff complained of anxiety, irritability, and depressive symptoms. The symptoms of anxiety developing into panic attacks and escalating irritability were identified as "essentially the same as they have been in the past." (R. at 356.) Dr. Periolat's notes further report that the Plaintiff had an "unreasonable but persisting fear" of developing epilepsy and that she complained of occasional recent memory lapses. (R. at 356.) Dr. Periolat assessed the Plaintiff as having "moderate but escalating anxiety, irritability, somatic fears," and diagnosed her with chronic adjustment disorder with mixed anxiety and depressed mood.[1] (R. at 356.) He directed the Plaintiff to begin taking Fluoxetine (treats depression) and Topiramate (anticonvulsant used off-label to treat bipolar disorder).

After this initial appointment, the Plaintiff had several follow-up appointments with Dr. Periolat. On October 5, 2010, the Plaintiff informed Dr. Periolat that she had visited the emergency room twice for panic attacks and was prescribed medication on each occasion. The

---

[1] For the mental status exam of the Plaintiff, Dr. Periolat noted that she had: a well groomed appearance; a cooperative attitude; normal psychomotor, mood, and speech; appropriate affect; logical goal directed thought process; thought content without delusions; perceptual without hallucinations; normal cognition and reasoning; full consciousness; intact orientation times four; intact memory, judgment, insight, attention/concentration, executive functioning, and language; average intelligence; no hallucinations; and no signs of being suicidal, violent, or homicidal, as well as no violent thoughts. At the Plaintiff's subsequent appointments, the mental status exams did not contradict the results from this initial exam, but Dr. Periolat's later exams generally covered fewer categories than those listed above.

Plaintiff further reported that she had not taken Topiramate as directed because she connected this anticonvulsant to her irrational fear of getting seizures. However, the Plaintiff took the Fluoxetine and it "provided some relief from her irritab[i]lity," but she still experienced somatization fears. (R. at 363.) Dr. Periolat instructed the Plaintiff to take Topiramate in the afternoon when she experienced the unwell feeling that often preceded an anxiety attack.

On November 9, 2010, the Plaintiff informed Dr. Periolat that the Topiramate helped control her anxiety and panic attacks, but she still reported "that often during the day she has near panic attacks." (R. at 361.) Although the Plaintiff stated her depression had improved and she had no side effects from the current medication, Dr. Periolat assessed her as having ongoing pressure of thought and anxiety during waking hours and "press[ure] of thought makes sleep diffic[ult,] as well as concentration under stress of child care and ongoing financial prob[lem]s." (R. at 361.) Dr. Periolat also increased her dosage of Topiramate and left her other medications unchanged.

On February 8, 2011, the Plaintiff reported overall improvement in her anxiety and mood. Nevertheless, she still experienced near panic attacks and "severe anxiety out of the protective environment of her home," as well as cognitive side effects from Topiramate. (R. at 359.) Dr. Periolat's treatment plan called for an increase in the Topiramate dosage, but noted trial and error with the daily schedule would be necessary to achieve further anti-anxiety and anti-panic effect without cognitive side effects. Dr. Periolat assessed the Plaintiff as "[u]changed." (R. at 359.)

On February 11, 2011, Dr. Periolat completed a Psychiatric/Psychological Impairment Questionnaire. Dr. Periolat diagnosed the Plaintiff's condition as adjustment disorder with mixed features and the prognosis was "[g]uarded." (R. at 369.) The Plaintiff had a current GAF score of

60, and her lowest GAF score in the past year was 40. When asked to identify the positive clinical findings that demonstrate and/or support his diagnosis, Dr. Periolat marked the following:

> Appetite disturbance with weight change; Mood disturbance; Emotional lability; Recurrent panic attacks; Psychomotor agitation or retardation; Difficulty thinking or concentrating; Illogical thinking or loosening of associations; Persistent irrational fears; Generalized persistent anxiety; [and] Hostility and irritability.

(R. at 370.) Dr. Periolat marked her primary symptoms as "persistent panic and anxiety[,] particularly when interacting out of her home," with "[p]anic at interpersonal interaction" being the more frequent and/or severe symptom. (R. at 371.) Dr. Periolat then rated the Plaintiff's mental activities "within the context of [her] capacity to sustain that activity over a normal workday and workweek, on an ongoing basis in a competitive work environment," with those activities covering "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interactions," and "Adaptation." (R. at 372–73.) Dr. Periolat assessed the Plaintiff as markedly limited in eleven activities, moderately limited in six activities, and mildly limited in three activities.[2] Further, Dr. Periolat answered that the Plaintiff experiences episodes of deterioration or decompensation in work or work like settings that cause her to withdraw from that situation and/or exacerbates her signs and symptoms because she has "[i]ntense anxiety with interpersonal interaction." (R. at 374.) Dr. Periolat stated that the Plaintiff is not a malingerer, and, based on his examinations of her and her prior attempts to work, she is incapable of

---

[2] The questionnaire defined those terms as follows: markedly limited means "effectively precludes the individual from performing the activity in a meaningful manner"; moderately limited means "significantly affects but does not totally preclude the individual's ability to perform the activity"; and, mildly limited means "does not significantly affect the individual's ability to perform the activity." (R. at 371.)

tolerating even "low stress" at work. (R. at 375.) Dr. Periolat also estimated that the Plaintiff would be absent from work more than three times a month due to her impairments or treatment.

In her decision, the ALJ determined that Dr. Periolat's opinion was entitled to "only some weight" because "most of it is inconsistent with the record, including Dr. Periolat's own treatment records." (R. at 48.) The ALJ defined Dr. Periolat's opinion by citing to several portions of the questionnaire that Dr. Periolat completed on February 11, 2011. Specifically, the ALJ cited six of the eleven activities for which Dr. Periolat rated the Plaintiff as markedly limited, those being her ability (1) to carry out detailed instructions, (2) to work in proximity to others without being distracted by them, (3) to perform tasks within a schedule and to maintain regular attendance, (4) to make simple work related decisions, (5) to interact appropriately with the general public, and (6) to get along with co-workers without distracting them or exhibiting behavioral extremes. The ALJ also cited Dr. Periolat's opinion that the Plaintiff was moderately limited in her ability to understand and remember detailed instructions, which is one of the six activities for which she received this rating, and Dr. Periolat's opinion that she experienced episodes of decompensation in work-like settings.

The ALJ found Dr. Periolat's opinions inconsistent with the record because she found "no evidence that since the alleged onset date, the [Plaintiff] has experienced any episodes of decompensation for an extended duration," specifically highlighting an absence of hospitalizations, the Plaintiff's limited medical treatment, and her admissions that she does not take her medication as prescribed. (R. at 48.) Further, apparently to rebut Dr. Periolat's opinions that the Plaintiff is markedly limited in her "ability to make simple work related decisions" and "perform [tasks] within a schedule [and] maintain regular attendance" (R. at 372–73), the ALJ

stated that the Plaintiff's ability to care for her daughter and be "deemed a good mother," even without her medication, indicates that "she is able to perform tasks and make simple decisions." (R. at 48.) The ALJ also cited the Plaintiff having "a friend and a significant other of four years with whom she often socializes with" as evidence that she "can get along with others and is not markedly limited." (R. at 48.) Nevertheless, the ALJ determined that an unspecified portion of "her psychological consultative examination" provided "some evidence she has some cognitive impairments that would warrant" her to find that the Plaintiff is "moderately limited in the carrying out of detailed instructions," which justifies the Plaintiff being "limited to simple tasks and job instructions." (R. at 48–49.)[3]

---

[3] On July 21, 2010, at the request of the Indiana Disability Determination Bureau, the Plaintiff underwent a psychological consultative examination with Craig Nordstrom, Psy.D., the State Disability Determination Services psychological consultative examiner. The Plaintiff was accompanied by her mother, and Dr. Nordstrom conducted a clinical interview, a mental status examination, and administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV). The Plaintiff and her mother summarized the Plaintiff's medical, education, and work history. Dr. Nordstrom also wrote that the Plaintiff stated she did not take her medication "due to lack of insurance and lack of funds." (R. at 349.) Dr. Nordstrom concluded that the Plaintiff appeared unable to manage funds independently, and diagnosed her with bipolar disorder not otherwise specified; polysubstance dependence, sustained full remission; rule out substance-induced mood disorder, with mixed features; rule out learning disorder not otherwise specified; and rule out personality disorder not otherwise specified; however, he also reported that the Plaintiff's "Full Scale IQ score corresponds to the [less than] .1 percentile and the extremely low range of intellectual functioning" and that "[d]ue to apparent deficits in effort, this WAIS-IV is considered to be invalid." (R. at 350.) Dr. Nordstrom further noted that the Plaintiff's "word-choice, manner of speech, and her point out . . . that she 'spoke to herself in the third person,' indicates a level of intellectual functioning higher than her WAIS-IV results would suggest." (R. at 350.) The Plaintiff testified that she was "really nervous" and could not focus on what Dr. Nordstrom wanted her to do. (R. at 74.)

The ALJ did not indicate how much weight she assigned to Dr. Nordstrom's opinions, but the ALJ discussed Dr. Nordstrom's report at length and cited to it to support her adverse credibility determination. Specifically, the ALJ noted Dr. Nordstrom's reasons for invalidating the WAIS-IV to support her conclusion that "the objective findings from the [Plaintiff's] treatment records do not support a finding that the [Plaintiff] is more limited than the limitations outlined in the [RFC]." The ALJ also relied upon "Dr. Nordstrom's finding that the [Plaintiff's] cognitive deficiencies are not as severe as she alleges" as being corroborative of her ability to work at her previous jobs despite her "alleged cognitive impairments." (R. at 50.)

The Plaintiff argues that Dr. Periolat's opinions should have received controlling weight because they were supported by undisputed, appropriate psychiatric findings. Further, she contends that the ALJ's reliance upon the Plaintiff's lack of decompensations, limited medical care and noncompliance with medication plans, and her ability to care for her daughter (as well as have a friend and a significant other), do not constitute substantial evidence that contradicts Dr. Periolat's opinions. Alternatively, the Plaintiff asserts that remand is appropriate because the ALJ failed to apply the checklist factors, 20 C.F.R. §§ 404.1527(c), 416.927(c), to determine what weight to attribute to Dr. Periolat's opinions and the RFC determination lacked the specificity required to allow for effective judicial review. In response, the Commissioner contends that the ALJ correctly found that Dr. Periolat's opinions were inconsistent with the record and his own treating notes, and thus properly attributed them only some weight.

Although an ALJ is not required to address every piece of evidence or testimony presented, she must provide a "logical bridge" between the evidence and the conclusions. *Terry*, 580 F.3d at 475. Most notably, the ALJ failed to construct this bridge in relation to the Plaintiff's treatment history, which the ALJ relied upon to discount Dr. Periolat's opinions. The "[social security] regulations expressly permit the ALJ to consider a claimant's treatment history," *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009), including the claimant's compliance with her physician's treatment recommendations, *see Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007); however, the ALJ does not adequately account for the nature of bipolar disorder (which the ALJ deemed a "severe impairment") and its impact on the Plaintiff's compliance with her prescribed medication regimen. *Kangail v. Barnhart*, 454 F.3d 627, 630–31 (7th Cir. 2006) ("[I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar

13

disorder in particular . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. The administrative law judge did not consider this possibility.") (internal citations omitted); *see also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (noting that bipolar disorder "is by nature episodic and admits to regular fluctuations even under proper treatment," and concluding that the ALJ "must consider possible alternative explanations" for the plaintiff's non-compliance with prescribed medications); *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (recognizing that the plaintiff failed to take her medication during manic spells, and that generally patients are often reluctant to take antidepressant drugs because of serious side effects and "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently") (citing *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010)); *Spiva*, 628 F.3d at 351 (finding that the ALJ's reference to the Plaintiff's failure to take his medications "ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications").

The ALJ concluded that the Plaintiff "has barely treated [sic] and admits she does not take her medication as prescribed" (R. at 48), but the ALJ did not consider any reasons for this behavior. (*See also* R. at 49 ("Although, the evidence shows the claimant has been diagnosed with bipolar disorder and a learning impairment, she does not take her medications even though she admits these medications significantly stabilize her mood and decrease her anxiety. She also sparsely treats for these conditions and admitted at the hearing that she is not going to therapy.") (credibility determination).) Dr. Periolat's notes show that the Plaintiff initially refused to take her medication for irrational reasons, and after she started taking Topiramate, she reported having

side effects. Further, Dr. Periolat increased the Plaintiff's doses over time and one of his later notes acknowledged that additional trial and error was necessary to balance the medication's relief with the side effects. The Plaintiff also testified that she was not seeing a therapist at the time of the hearing "[b]ecause [she had not] found one that works for [her]," but she was still taking medication and experiencing side effects. (R. at 66.) In particular, she testified that her medications make her "hands and feet go numb" and "give [her] headaches on top of the anxiety." (R. at 66–67.) The ALJ's failure to account at all for the various reasons that the Plaintiff may not have been compliant with her medication plan is an error.

The ALJ also tied the Plaintiff's noncompliance with her medication plan to the Plaintiff's ability to care for her daughter, reasoning that she "has been deemed a good mother" even without her medication. (R. at 48.) The characterization of the Plaintiff as a "good mother" appeared in the report prepared by Craig Nordstrom, Psy.D., the State Disability Determination Services psychological consultative examiner, after he performed a psychological consultative examination. The report stated that the Plaintiff's mother described the Plaintiff as "a good mother. She takes care of her daughter." (R. at 347.) Putting aside that the Plaintiff's mother did not specify whether she believed the Plaintiff was a good mother when she was not medicated, it is unclear how this remark is sufficient to constitute "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson*, 402 U.S. at 401, that Dr. Periolat's assessment of how the Plaintiff's medical impairments will limit her in a work environment is not entitled to controlling weight, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("A treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record.") (quoting 20 C.F.R. §

15

404.1527(d)(2)). Further, the ALJ's paraphrasing of the activities listed on the questionnaire is illustrative of the "recurrent, and deplorable, feature of opinions by [ALJs] in social security disability cases" of failing to recognize the "critical differences between activities of daily living and activities in a full-time job." *Cf. Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (observing this trend in the context of a plaintiff's credibility determination). For example, Dr. Periolat's opinion that the Plaintiff was markedly limited in her "ability to make simple work related decisions" and "perform [tasks] within a schedule [and] maintain regular attendance" (R. at 372–73) was restated by the ALJ as her ability "to perform tasks and make simple decisions," (R. at 48), and being a good mother met this ALJ-defined activity for which Dr. Periolat had not stated his opinion. Therefore, the ALJ has not offered "good reasons" for discounting the opinion of a treating physician. *Scott*, 647 F.3d at 739–40.[4]

---

[4]The Commissioner points to Dr. Periolat's normal findings from the mental status exams, which appear in his notes from each appointment with the Plaintiff, to show that there was evidence in the record inconsistent with Dr. Periolat's opinions. Although the ALJ did not explicitly reference the mental status exams in the paragraph where she explained the weight she assigned to Dr. Periolat's opinions, she did identify Dr. Periolat's opinions as "inconsistent with . . . Dr. Periolat's own treatment records" (R. at 48), and earlier referred to the findings from the mental status exams when summarizing the "medical evidence of the record," (R. at 47.) Assuming that the Commissioner's argument does not violate *Chenery*, *see Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (refusing to consider evidence cited by the Commissioner because that reason did not appear in the ALJ's opinion (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943))), the mental status exam findings are not sufficient to establish inconsistency, especially given the other errors committed by the ALJ, *see Geddes ex rel. Geddes v. Colvin*, No. 13 CV 312 BBC, 2014 WL 1671490, at *7 (W.D. Wis. Apr. 24, 2014) (directing the ALJ to reconsider the opinions of the treating physician where the ALJ discounted that doctor's findings because they were inconsistent with the unremarkable mental status examinations, even though that same doctor also expressed concerns about the plaintiff's mental health in his progress notes and final assessment); *Scott*, 647 F.3d at 739–40 (holding that an ALJ erroneously found a doctor's assessment internally inconsistent where the doctor opined that the plaintiff was markedly limited and likely to miss three days of work per month, but also said the plaintiff responded well to treatment, because the treatment notes showed the plaintiff still had symptoms even though she improved). "The very nature of bipolar disease is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Scott*, 647 F.3d at 740 (stating that the ALJ impermissibly cherry-picked from mixed results to support a denial of benefits).

Even if the ALJ offered sound reasons to deny Dr. Periolat's opinions controlling weight, the ALJ still would have been required to apply the checklist factors to determine how much weight to attach to his opinions. *Scott*, 647 F.3d at 740 ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009))). Except to the extent it can be argued that the ALJ considered the consistency and supportability of Dr. Periolat's opinions, the ALJ has not engaged in this analysis. Thus, the ALJ's consideration of Dr. Periolat's evaluation is unsatisfactory and also provides a basis for remand.

**B.      Credibility Determination**

An ALJ is in the best position to determine the credibility of witnesses, and a credibility determination will be overturned only if it is patently wrong. *Craft*, 539 F.3d at 678; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *see also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, when "the determination rests on 'objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor, appellate courts have greater freedom to review the ALJ's decision.'" *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (alterations omitted) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872

(7th Cir. 2000)). Additionally, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. The ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations. *Simila*, 573 F.3d at 517 (first citing 20 C.F.R. § 404.1529(c)(2)–(4); then citing *Prochaska*, 454 F.3d at 738).

The ALJ found the Plaintiff's "allegations are less than fully credible" because her "activities of daily living, social functioning, sparse medical treatment[,] and work history are inconsistent with her mental impairments." (R. at 49–50.) Specifically, the ALJ noted that the Plaintiff takes care of "all her daughter's needs," assists with household chores, and "enjoys spending time with her daughter, her family, her best friend, and her significant other." (R. at 49.) Further, although the ALJ recognized that the Plaintiff has bipolar disorder and a learning impairment, this was undermined by Plaintiff's noncompliance with her medication plan, her sparse treatment for her conditions, and the psychological consultative examiner's notes that reflected a lack of effort on the cognitive examinations he administered. (R. at 349–50 ("Due to apparent deficits in effort, [the] WAIS-IV is considered to be invalid.").) The ALJ also found that the Plaintiff was able to perform her jobs as a cashier, a factory worker, a fast food worker, and as a truck driver "despite her alleged cognitive impairments," which confirmed the psychological consultative examiner's "finding that the [Plaintiff's] cognitive deficiencies are not as severe as

she alleges." (R. at 50.)

As the Plaintiff points out, the ALJ's reasons for finding the Plaintiff not credible mirror those cited to reject the opinions of Dr. Periolat.[5] Although this, in itself, is not necessarily a problem, the ALJ's reasons for making an adverse credibility determination contain various flaws. First, the ALJ drew a negative inference from the Plaintiff's non-compliance with her medication plan, but at no point did the ALJ consider any explanations for why this occurred. *Jelinek*, 662 F.3d at 814 ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."); *Craft*, 539 F.3d at 679 ("[A]lthough the ALJ drew a negative inference as to [the plaintiff's] credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period."); *Lewis v. Colvin*, No. 14 CV 50195, 2016 WL 4530338, at *3–4 (N.D. Ill. Aug. 30, 2016) ("[T]he ALJ did not inquire into possible explanations for [the plaintiff's failure to consistently seek and follow through on treatment recommendations]—in particular, the very real possibility that her multiple impairments prevented her from complying.") (internal quotation marks and alteration omitted).

Second, the ALJ's conclusion that the Plaintiff was able to perform her prior jobs is unsupported by the record, and even if support exists, the ALJ has not provided an explanation to allow for meaningful review by this Court. The ALJ cited to no evidence in the record to support

---

[5] The Court acknowledges that the ALJ's determination as to whether Dr. Periolat's opinions are entitled to controlling weight may collapse into the ALJ's determination as to whether the Plaintiff's statements regarding her psychiatric symptoms are credible. *See Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) ("[B]ecause the ALJ found that [the plaintiff] was not credible in her reports of pain, she also gave [the treating physician's] opinion, which relied heavily on these reports, little weight." (citing *Schaaf v. Astrue*, 602 F.3d 869, 876 (7th Cir. 2010))).

her finding that the Plaintiff was able to perform her prior jobs as a cashier, a factory worker, a fast food worker, and a truck driver. In fact, the Plaintiff's testimony directly contradicted this conclusion. The Plaintiff testified that she was let go from her job at Burger King, where she was a fast food worker and a cashier, "because [she] came up short on [her] drawer too many times—well, I miscounted too many times on my money." (R. at 71.) She also testified that at her truck driving job, she abandoned her "truck on the side of the road and . . . got on a bus and came home" because she "got too overwhelmed" after getting lost so many times. (R. at 72.) Further, the Plaintiff testified that, at her factory job, she was unable to complete everything that she needed to finish within a day "[b]ecause [she] would get off task." (R. at 75.) These issues played a fundamental role in the ALJ's credibility determination, and remand is also necessary on this basis.[6]

## CONCLUSION

For the reasons stated above, the decision of the ALJ is REVERSED and REMANDED for proceedings consistent with this Opinion.

---

[6] Even though remand is appropriate based on the reasons discussed above, the ALJ should also consider whether she properly considered the Plaintiff's daily activities in relation to her credibility. It is permissible for an ALJ "to examine all of the evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of [the plaintiff's] impairments was credible or exaggerated'"; however, this is different from equating "activities [of daily living] with the rigorous demands of the workplace." *Alvarado v. Colvin*, — F.3d — , No. 15-2925, 2016 WL 4547349, at *4 (7th Cir. Sept. 1, 2016) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)) (noting that it was permissible for the ALJ to consider that the plaintiff was given "critical" tasks at the flower shop where he worked to undercut testimony that the plaintiff was not capable of doing *anything* in a workplace). It appears that the ALJ may have crossed this line. Also, the Plaintiff takes issue with the ALJ's reliance upon the conclusions by Dr. Nordstrom in his report. Applying the appropriate standard when determining the weight that should be afforded to Dr. Periolat's opinions may affect the reliance placed on Dr. Nordstrom's report. Therefore, the Court does not otherwise address the arguments related to Dr. Nordstrom's report.

SO ORDERED on September 28, 2016.

s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION